UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TYHEEM KEESH,

                    Plaintiff,

          v.

GLENN S. GOORD, et. al.,

                    Defendants.

_____

REPORT & RECOMMENDATION

04-CV-271A

## PRELIMINARY STATEMENT

By Order of Hon. Richard J. Arcara, Chief Judge, United States District Court for

the Western District of New York, dated November 14, 2006, all dispositive motions in the

above-captioned case have been referred to this Court for report and recommendation pursuant to

28 U.S.C. §§ 636(b)(1)(B)-(C).  (Docket # 85).

          Plaintiff Tyheem Keesh ("Keesh"), an inmate who was formerly incarcerated in

the Wende Correctional Facility ("Wende"), filed this action *pro se* under 42 U.S.C. § 1983.  His

Complaint raises claims of retaliation, First Amendment claims of access to the courts and free

exercise of religion and due process violations.  (Docket # 1).  The defendants he has named

include George Pataki, former Governor of the State of New York,[1] Frank J. Clark, Erie County

District Attorney, Glenn S. Goord, former Commissioner of the New York State Department of

Correctional Services ("DOCS"), Edward R. Donnelly, retired Superintendent of Wende,

_____

[1] Although named as a defendant, former Governor Pataki has not been served with a summons and
complaint in this action, and this Court thus has no jurisdiction to address Keesh's claims against him.

Thomas G. Eagen, Director of the Inmate Grievance Program at DOCS, and numerous members

of the correctional staff at Wende.

Currently before this Court are three separately-filed motions for summary

judgment: the first by District Attorney Clark (Docket # 62); the second by the remaining

defendants (hereinafter "the DOCS defendants") (Docket # 69); and, the third by Keesh (a

cross-motion for summary judgment).  (Docket # 83).


## FACTUAL BACKGROUND

The following factual summary is derived from Keesh's Complaint and the

statements of undisputed facts submitted by the parties in connection with the pending motions.

(Docket ## 1, 63, 71, 84, 88, 90).

On March 23, 2001, an incident occurred at Wende involving an inmate,

Christopher Simpson.  During the incident, Simpson had an altercation with a corrections officer,

knocked the officer unconscious and took his baton.  Simpson then used the baton to strike and

seriously injure several other corrections officers.  A criminal investigation and prosecution was

thereafter undertaken by the Erie County District Attorney's Office, which was handled by

Assistant District Attorney ("ADA") Thomas E. Fowler, Jr.  Simpson was indicted and

eventually pled guilty to four counts of assault in the second degree.

While the criminal investigation was pending, Keesh sent a letter to the District

Attorney's Office, dated March 23, 2001 (the "March 23 letter").  The letter was addressed to

"the District Attorney's Office" and signed by Keesh.[2]  In the letter, Keesh alleged that the

---

[2] Keesh signed the letter with his religious name "Tyheem Y. Allah" and provided his inmate number.

2

corrections officers actually had assaulted Simpson.  Martin Kearney, a DOCS Captain who worked at Wende and served as the liaison between Wende and the Erie County District Attorney's Office, was informed of Keesh's letter and initiated an investigation of Keesh's knowledge of the incident.  According to Kearney's affidavit, he directed that Keesh's cell be searched as part of his investigation in order to determine whether Keesh possessed any documents or other evidence relating to the assault.  Kearney also ordered the confiscation of Keesh's typewriter in order to investigate whether Keesh in fact had written the letter.

As directed by Kearney, Corrections Officers John Ball and Daniel Hatfield conducted a search of Keesh's cell on March 30, 2001.  Keesh's typewriter, several bowties, a religious instructional manual and other written materials, including legal papers, were taken.  As a result of his investigation, Kearney concluded that Keesh was not present during the Simpson incident.  The typewriter, bowties and some written materials eventually were returned to Keesh.[3]

ADA Fowler also received a copy of Keesh's letter, prompting him to interview Keesh.  Based upon the interview, Fowler likewise determined that Keesh had not been present during the incident and had no personal knowledge of it.  Although Fowler received a subsequent letter from Keesh, dated April 4, 2001, he had no further contact with him after their meeting.

Keesh thereafter filed a grievance and wrote to Superintendent Donnelly complaining that he was being harassed by the correctional staff in retaliation for his reporting the Simpson incident.  The grievance was subsequently denied.

---

[3] The bowties and some written materials were returned approximately one month after the search.  The typewriter was returned approximately two and one-half months later.  Keesh maintains that he never recovered his legal papers or his religious training manual.

On April 18, 2001, defendant Ekpe Ekpe, former First Deputy Superintendent of Wende, had an encounter with Keesh concerning the confiscation of Keesh's typewriter and other property. As Ekpe was walking through the cellblock, Keesh asked permission to speak with him. Keesh complained to Ekpe that his typewriter and other items had been confiscated as part of an investigation relating to the Simpson assault. Suspecting that Keesh might have information relevant to the criminal investigation, Ekpe directed that Keesh be confined in his cell ("keeplocked") so that he could be interviewed. Ekpe later learned from Kearney that Keesh's knowledge was already being investigated and that his typewriter and other property were being held as possible evidence. At that point, Ekpe directed that Keesh be released from keeplock. Ekpe states that Keesh was keeplocked for approximately one hour; Keesh counters that the confinement lasted approximately twenty-four hours.

Corrections Officer Edwin Mendez conducted a second search of Keesh's cell on May 30, 2001. During the search, a weapon fabricated from the lid of an aluminum can was discovered under Keesh's mattress. Mendez then prepared a misbehavior report charging Keesh with possession of the weapon, and a disciplinary hearing was conducted before Hearing Officer Thomas Schoellkopf. During the hearing, Keesh claimed that the weapon had been planted in his cell in retaliation for the March 23 letter. Schoellkopf found Keesh guilty and sentenced him to confinement in the Special Housing Unit and loss of privileges for 180 days. That ruling was subsequently reversed by Donald Selsky, the Director of Special Housing/Inmate Discipline, based upon his finding that the "circumstances of the case warranted further inquiry into the reason for [the] search."[4]  (Docket # 82, Ex. C).

---

[4]  Director Selsky first upheld the determination and later expunged it upon reconsideration.

4

Also in May 2001 Keesh sought election to the Inmate Grievance Resolution Committee (the "IGRC"), a committee consisting of inmates and appointed staff members that oversees the Inmate Grievance Program.  Keesh was one of four candidates for two open inmate positions on the committee.  The ballot reflected that Keesh received the fewest votes of the four candidates.  Keesh maintains that the election was "rigged" against him in retaliation for the March 23 letter.

Keesh's Complaint raises the following claims.  First, Keesh contends that defendants have retaliated against him for the March 23 letter and for complaining about such retaliation.  Specifically, Keesh asserts that defendants unlawfully searched his cell on two occasions, assaulted and keeplocked him, conspired to plant a weapon in his cell, filed a false misbehavior report relating to the discovery of the weapon and falsely reported the results of an election so as to deny him a position on the IGRC.  Keesh also contends that the confiscation of his property – namely, his typewriter and bowties, religious manual and various legal papers – violated his First Amendment right of access to the courts and of free exercise of his religion.  Finally, Keesh claims that he was denied due process of law because his disciplinary hearing was conducted by a biased hearing officer who had prejudged his guilt.  (Docket # 1).

## DISCUSSION

Three motions for summary judgment are currently pending before the Court.  District Attorney Clark seeks dismissal of the claims against him on the grounds that Keesh has not demonstrated his personal involvement in any alleged constitutional deprivations.  (Docket # 62).  Three DOCS defendants – Commissioner Goord, Superintendent Donnelly and Director

Eagen – also seek summary judgment on the same basis.  (Docket # 69).  In addition, all of the

DOCS defendants seek dismissal of Keesh's claims on the grounds that they do not sufficiently

allege constitutional violations.  (Docket # 69).  Finally, Keesh has cross-moved for summary

judgment in his favor.  (Docket # 83).

## I.   <u>Standard for Summary Judgment</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  In reaching this determination, the court must assess whether

there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir.

1991).

A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir.

1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Bryant*

*v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact, after which the nonmoving party must come forward with

sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d at 982 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution. . . . It must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

> Rule 56 of the Federal Rules of Civil Procedure provides that:

> When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). "Affidavits opposing summary judgment must, among other things, be based "on personal knowledge." *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995). "'An affidavit is not based on personal

knowledge if, for example, it is based on mere suspicion, rumor, hearsay or secondhand information.'" *Batista v. Goord*, 2005 WL 2179420, *3 (N.D.N.Y. 2005) (quoting *Applegate v. Top Assocs., Inc.,* 425 F.2d 92, 97 (2d Cir. 1970)).

In cases brought by plaintiffs acting *pro se*, courts must construe the pleadings liberally and "interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Houston v. Zen Zen*, 388 F. Supp. 2d 172, 173 (W.D.N.Y. 2005) (quoting *Hernandez v. McGinnis*, 272 F. Supp. 2d 223, 226 (W.D.N.Y. 2003)).

## II.  Motions for Summary Judgment Based Upon Lack of Personal Involvement

Clark, Donnelly, Goord and Eagen contend that they cannot be held liable under Section 1983 because Keesh has failed to allege that they were personally involved in the events giving rise to his claims. (Docket ## 65, 70). It is well-settled that "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Colon v. Coughlin*, 58 F.3d at 873 (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted)). Supervisors cannot be held liable under Section 1983 on a theory of vicarious liability or *respondeat superior*. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "A plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must show that the supervisor was personally involved in the alleged

constitutional deprivation." *Houghton v. Cardone*, 295 F. Supp. 2d 268, 276 (W.D.N.Y. 2003)

(citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001)).  A

supervisory defendant's personal involvement may be demonstrated by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id*.

In this matter, Keesh has not offered any evidence to suggest that Clark, Goord or

Eagen created or continued policies or customs that resulted in the deprivation of his

constitutional rights.  In addition, no credible evidence has been presented to this Court to

demonstrate that any of these defendants acted with gross negligence in their supervision of other

DOCS employees.  Finally, Keesh has provided no evidence that any of the defendants were

aware of constitutional violations that they failed to correct or that they acted with deliberate

indifference towards Keesh's constitutional rights.

With respect to his claims against Clark, Keesh alleges that Deputy Commissioner

Leclaire and Captain Kearney told him that Clark had directed the search of his cell and the

confiscation of his typewriter.  (Docket # 1 at ¶¶ I-J; Docket # 84 at Exhibit ("Ex.") 37).

According to Keesh, Clark's actions were "based on prosecutorial vindictiveness . . . and [were]

a pretext for a criminal investigation."  (Docket # 84 at 38).  Although I find that Keesh has

adduced sufficient evidence to raise a genuine factual dispute as to whether Kearney ordered the

search and confiscation of the typewriter at the direction or suggestion of the District Attorney's

Office,[5] I find that he has not come forward with sufficient evidence to raise a triable issue of fact

as to District Attorney Clark specifically.  The record contains sworn assertions by both District

Attorney Clark and ADA Fowler that Clark had no personal involvement in the investigation of

Keesh's allegations.  (Docket # 64-8, Responses 4 and 5; Docket # 64-2 at ¶¶ 11-12).  While the

record does contain a statement by Kearney that the typewriter was confiscated "at the behest of

the D.A." (Docket # 78, Ex. B), the statement does not state that Kearney communicated directly

with District Attorney Clark, as opposed to ADA Fowler or another member of the District

Attorney's Office.  Indeed, the record is devoid of any specific factual allegations that District

Attorney Clark himself participated in the decision to search Keesh's cell.  In the absence of

competent evidence that District Attorney Clark was personally involved in the decision, Keesh's

Section 1983 claims against him should be dismissed.

     Keesh alleges claims against Goord and Eagen based upon their purported failure

to address satisfactorily his complaints and grievances.  (Docket # 1 at ¶¶ O, Z, Zi, Zj, Zk, Zn,

Zu).  Keesh himself testified that neither Goord nor Eagen were present at Wende and were not

---

     [5] Kearney has submitted an affidavit attesting that it was he who ordered the cell search and the
confiscation of Keesh's typewriter.  (Docket # 79 at ¶ 8).  Appended to his affidavit, however, is a report that was
prepared by Kearney for Superintendent Donnelly concerning the cell search.  Contrary to the representation in his
current affidavit, Kearney states in his report, "at the behest of the D.A., [Keesh's] typewriter was confiscated."  This
apparent inconsistency is troubling to the Court and, regrettably, is not explained or even acknowledged in
defendants' motion papers.

personally involved in the incidents giving rise to his claims.  (Docket # 72-2 at 100).  At most,

the record shows that Goord referred Keesh's complaints to other DOCS supervisors for

investigation and response (Docket # 76 at ¶ 6) and that, as a nonvoting member of the Central

Office Review Committee ("CORC") for the Inmate Grievance Program, Eagen signed

determinations made by CORC on grievances filed by Keesh.  (Docket # 71 at ¶ 57; Docket # 84,

Appendix).  These allegations are insufficient to give rise to Section 1983 claims against either

Goord or Eagen.  *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (affirming dismissal of

Section 1983 claims against DOCS Commissioner who received letter from plaintiff and referred

it for response to another supervisor); *H'Shaka v. Drown*, 2007 WL 1017275, *17 (N.D.N.Y.

2007) (noting Eagen's position as nonvoting member of the CORC and dismissing Section 1983

claim against him); *Ramsey v. Goord*, 2005 WL 2000144, *8 (W.D.N.Y. 2005) (allegation that

Eagen denied grievance insufficient to give rise to Section 1983 claim); *Liner v. Goord*, 310 F.

Supp. 2d 550, 555 (W.D.N.Y. 2004) (allegation that official ignored letters of complaint

insufficient to establish Section 1983 claim); *Thomas v. Coombe*, 1998 WL 391143, *6

(S.D.N.Y. 1998) ("the fact that an official ignored a letter alleging unconstitutional conduct is not

enough to establish personal involvement").  "Where a supervisor's involvement in a prisoner's

complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has

insufficient personal involvement to sustain a § 1983 cause of action."  *Allah v. Poole*, 2007 WL

2317566, *15 (W.D.N.Y. 2007) (quotation omitted).  *Accord Barnes v. Henderson*, 490 F. Supp.

2d 313, 319 (W.D.N.Y. 2007); *Garvin v. Goord*, 212 F. Supp. 2d 123, 126 (W.D.N.Y. 2002).

Accordingly, I find that Keesh has failed to sufficiently allege Section 1983 claims against either

11

Goord or Eagen, and it is therefore my recommendation that summary judgment be granted in their favor.

I reach a contrary conclusion with respect to Keesh's claims against Superintendent Donnelly. Keesh alleges that Donnelly himself, as well as other defendants, informed him that his legal papers had been confiscated in retaliation for his filing lawsuits against DOCS employees. (Docket # 1 at ¶ H). He also alleges that Donnelly admitted to him that "he (Donnelly) knew I never had a weapon but he was gonna make sure I suffer because I filed a civil action and complaints against him in the past." (Docket # 1 at ¶ Zl). According to Keesh, he was also told by Corrections Officer Mendez that Donnelly and others sought to "set [him] up with a fabricated Misbehavior Report" in retaliation for having written grievances related to inmate Simpson. (Docket # 1 at ¶ Ze).

Although the merits of these assertions must await the outcome of trial, I find that Keesh has adequately demonstrated the existence of disputes of material fact as to whether Donnelly personally participated in the alleged conduct underlying his Section 1983 claims. *See Houghton v. Cardone*, 295 F. Supp. 2d at 276. I therefore recommend denial of Donnelly's motion for summary judgment on the grounds of lack of personal involvement.

## III.  **DOCS Defendants' Motion for Summary Judgment**

Keesh's claims against the remaining DOCS defendants may be organized conceptually into three categories: retaliation claims; claims arising from the deprivation of property; and, due process claims. Keesh believes he is entitled to summary judgment on all of

his claims; the DOCS defendants believe they are entitled to judgment on all of the claims.  In

my judgment, neither party is entirely correct.

  **A.**  **Keesh's Retaliation Claims:**  Keesh alleges that the defendants subjected him

to retaliatory treatment for writing the March 23 letter.  Because he wrote that letter, Keesh

claims, his cell was searched on March 30 and May 30, 2001, he was assaulted and keeplocked

on April 11, 2001, the IGC election was "rigged" to ensure that he was not elected and a false

misbehavior report was issued resulting in the imposition of a substantial disciplinary sentence.

(Docket # 1).

  The First Amendment protects inmates from retaliation by prison officials for

exercising their constitutional rights to petition the government for redress of grievances.  *See*

*Colon*, 58 F.3d at 872 (citations omitted); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).  To

establish a retaliation claim under Section 1983, a prisoner must demonstrate that he engaged in

constitutionally protected activity and that such activity was a substantial or motivating factor in

the prison officials' decision to discipline him.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  If the

plaintiff is able to make this showing, the burden shifts to the defendants to demonstrate, by a

preponderance of the evidence, that the prisoner would have been disciplined "even in the

absence of the protected conduct."  *Id.*  "Thus, if taken for both proper and improper reasons,

[defendants'] action may be upheld if the action would have been taken based on the proper

reasons alone."  *Id.  See also Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984) ("the undisputed

facts may demonstrate that the challenged action would have been taken on the valid basis alone,

and such a conclusion will frequently be readily drawn in the context of prison administration

where we have been cautioned to recognize that 'prison officials have broad administrative and discretionary authority over the institutions they manage'") (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)).

The Second Circuit has recognized that retaliation claims brought by prisoners are particularly "prone to abuse." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). As the court has noted, "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) (quoting *Flaherty v. Coughlin*, 713 F.2d at 13), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). For this reason, retaliation claims must be reviewed with special care. *Colon*, 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care").

**1. The Cell Searches:** Keesh alleges that defendants retaliated against him when they performed a search of his cell on March 30, 2001. Specifically, Keesh contends that Captain Kearney, who ordered the search, and Corrections Officers Ball and Hatfield, who performed the search, were retaliating against him for having written the March 23 letter. Defendants do not contest that the decision to search was made in response to Keesh's letter, but argue that it was not motivated by retaliation.

Settled authority establishes that inmates have no constitutionally protected right of privacy in their cells. *See Hudson v. Palmer*, 468 U.S. 517, 527 (1984). Indeed, the search of

an inmate's cell, even if performed with a retaliatory motive, does not give rise to a constitutional claim for retaliation.  *See id.*; *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 327 (W.D.N.Y. 2007) ("[i]t is well settled . . . that plaintiff cannot base a retaliation claim . . . based on a cell search"); *Salahuddin v. Mead*, 2002 WL 1968329, *5 (S.D.N.Y. 2002) ("a retaliatory cell search is insufficient to support a First Amendment retaliation claim") (collecting cases); *Gadson v. Goord*, 1997 WL 714878, *7 (S.D.N.Y. 1997) ("searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature"); *Payne v. Axelrod,* 871 F. Supp. 1551, 1556 (N.D.N.Y. 1995) ("*Hudson v. Palmer* [] permits even arbitrary cell searches in prison").  This well-established caselaw also disposes of Keesh's claim that the May 30, 2001 cell search constitutes actionable retaliation.[6]

Although the cell searches may not give rise to a retaliation claim, the confiscation or destruction of property taken at the time of the searches may.  *Smith v. City of New York*, 2005 WL 1026551, *3 (S.D.N.Y. 2005) ("retaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action").  Keesh alleges that Kearney, Ball and Hatfield conspired to retaliate against him when they confiscated his typewriter, bowties, religious training manuals and various legal papers.  Having carefully reviewed the submissions by both parties, I find that neither side is entitled to summary judgment on this claim; rather, a genuine dispute of material fact exists as to the reason the property was taken.

---

[6] While his retaliation claim may not be based upon the cell search itself, it may be based upon the issuance of a false misbehavior report.  *See* discussion *infra* at 20-21.

On the one hand, Kearney affirms that he ordered the typewriter to be confiscated in order to investigate whether Keesh actually wrote the March 23 letter (Docket # 78,  ¶¶ 7-12), and Ball and Hatfield have affirmed that they knew nothing about the March 23 letter when they performed the search (Docket # 73 at ¶¶ 4-6; Docket # 77 at ¶¶ 4-6).  On the other, Keesh claims that all three defendants (Kearney, Ball and Hatfield) told him that his property was being taken from him because of his complaints and lawsuits.  (Docket # 1 at ¶¶ G-H).  In addition to these contrasting assertions, the record contains apparently inconsistent statements by Kearney himself concerning whether he or the District Attorney's Office ordered the confiscation of Keesh's typewriter.  (*See* n.5 *supra*).  These conflicting allegations sufficiently raise a triable issue of fact as to the impetus behind the decision to confiscate Keesh's property.  *See Allah v. Greiner*, 2007 WL 1280657, *5 (S.D.N.Y. 2007) ("given the plausible motivation for [defendant] to retaliate, the time of the confiscation, and [defendant's] own conflicting accounts as to the motivation for the search, defendants have not carried their burden of showing that [defendant] would have ordered the confiscation absent the alleged improper motives"; "[i]ssues of fact remain which require credibility determinations, a proper function of the jury and not this Court in review of a summary judgment motion").

**2.  Keesh's Confinement to his Cell:**  Keesh also asserts claims for assault and retaliation based upon an encounter he had with Superintendent Ekpe on April 11, 2001.  (Docket # 1 at ¶¶ S-2).  On that date, while Ekpe was making rounds, Keesh complained to him about alleged retaliation he perceived as a result of the March 23 letter.  According to Keesh, Ekpe responded in a "violent, assaultive mannerism" by "yelling profanity and vulgarity" and directed that he be confined to his cell.  (Docket # 1 at ¶¶ T-U).

16

In his affidavit, defendant Ekpe acknowledges that he had a conversation with Keesh about the Simpson matter and the confiscation of Keesh's property, as a result of which he directed that Keesh be confined to his cell.[7]  (Docket # 75).  Ekpe maintains that he decided to keeplock Keesh – not out of retaliation – but because he wanted Keesh to be interviewed regarding his knowledge of the Simpson incident without being tainted by information provided to him by other inmates.  (Docket # 75 at ¶¶ 5, 7).  In other words, Ekpe wanted to segregate Keesh before he was questioned – protocol that Ekpe describes as "standard procedure" in DOCS' investigations.  (Docket # 75 at ¶ 7).  According to Ekpe, approximately one hour later, he learned from Kearney that Keesh was already under investigation relating to the incident and directed that Keesh be released from keeplock.  (Docket # 75 at ¶¶ 5-7).  Ekpe states that Keesh was confined for "approximately one hour."  (Docket # 75 at ¶ 7).

Keesh's allegations are insufficient to state a Section 1983 claim for assault against Ekpe.  Keesh admits that he was not physically touched or harmed in any way.  (Docket # 72-2 at 63-64).  Rather, he contends that Ekpe used profanity and acted with "hostile" and "violent, assaultive mannerism[s]."  (Docket # 1 at ¶ U).  Such allegations are insufficient to support a Section 1983 claim.  *See Amaker v. Foley*, 2003 WL 21383010, *4 (W.D.N.Y. 2003) ("[w]ithout more, [] allegations of verbal threats, abusive language and racial epithets cannot form the basis of a section 1983 claim"), *aff'd*, 117 Fed. Appx. 806 (2d Cir. 2005); *Jermosen v.*

---

[7]  Keesh alleges that he spoke to Ekpe in the hallway of the Wende Correctional Facility on April 11, 2001. (Docket # 1).  Ekpe references the same conversation twice in his affidavit.  In the first, he states that it occurred on April 18, 2001 (Docket # 75 at ¶ 5); in the second, he states that it occurred on April 11, 2001 (Docket # 75 at ¶ 6). Viewing the entire record before the Court, which includes copies of memoranda and grievances referencing the incident on April 11, 2001, the reference to April 18, 2001 appears to be a mistake.

*Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1995) ("[v]erbal threats or abuses are not sufficient

to state a constitutional violation cognizable under § 1983").

By contrast, Keesh's retaliation claim relating to his keeplock confinement should

be permitted to proceed to trial.  Although the issue is extremely close, I find that Keesh has

alleged minimally sufficient facts to counter Ekpe's contention he was not motivated by

retaliation in deciding to keeplock Keesh.  In making this finding, I take particular note of a

memorandum prepared by Ekpe several days after the incident, in which he describes Keesh's

statements about the Simpson incident as "very frivolous and annoying."  According to the

memorandum, Ekpe replied that it was not Keesh's "prerogative to make misleading and false

statements" and ordered him to "stand back in line and keep quiet."  (*Id.*).  This memorandum,

when considered in connection with the entire record, adequately raises triable issues of fact

concerning Ekpe's motivation in ordering Keesh confined to this cell.  *See*, *e.g.*, *Colon*, 58 F.3d

at 872 (temporal proximity between an inmate's [exercise of his protected rights] and [adverse]

action may serve as circumstantial evidence of retaliation").

Defendants argue that this claim can nonetheless be dismissed because Keesh's

keeplock confinement was *de minimis*.  I disagree and find that summary judgment is

inappropriate for either party on this claim.

"While . . . the scope of conduct that can constitute actionable retaliation in the

prison setting is broad, it is not true that every response to a prisoner's exercise of a

constitutional right gives rise to a retaliation claim."  *Dawes v. Walker*, 239 F.3d at 492-93; *see*

*also Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (alleged retaliation must be more than *de*

*minimis*).  Retaliation is actionable only if such retaliation is likely to "deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights."  *Dawes*, 239

F.3d at 492-93.  Otherwise, the retaliatory act is deemed *de minimis* and is not actionable under

Section 1983.  *Id.*

Defendants' contention that Keesh's keeplock confinement was *de minimis* is

premised upon the assertion that its duration was approximately one hour.  (Docket # 70 at 13).

Keesh disputes that assertion, however.  (Docket # 88 at ¶ 29).  He maintains that it lasted one

day, a representation that is supported by certain DOCS' records, including a memorandum

prepared by Captain Kearney reflecting his investigation of that matter.  (Docket # 88 at ¶ 29;

Docket # 84 at Ex. 44).  That memorandum states that Keesh was confined on April 11, 2007 and

released the following morning.  If true, and crediting Keesh's statements that he was confined at

approximately 8:00 a.m. on the 11th (Docket # 1 at ¶¶ 5-11), he would have been confined for

nearly twenty-four hours.  The record also suggests that Keesh may have been deprived of meals

during his confinement.  (Docket # 84, Ex. 9).

Considering these factual disputes, I cannot conclude that Keesh's confinement

was *de minimis* as a matter of law.  *See*, *e.g.*, *Gill v. Tuttle*, 2004 WL 605281, *3 (2d Cir. 2004)

(reversing determination that nine days of keeplock confinement was *de minimis*); *Lashley v.

Wakefield*, 367 F. Supp. 2d 461, 467 (W.D.N.Y. 2005) (retaliation claims may be based on

twenty-day keeplock confinement); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 123-24 (N.D.N.Y.

2003) (same for four and twenty-one day periods).  Rather, the jury should resolve those disputes

and then determine whether a similarly-situated inmate would likely be deterred from exercising

his rights as Keesh did.  *See*, *e.g.*, *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir.

2004) (question of adverse action in retaliation claim "involved a material issue of fact that

should have been reserved for a jury"); *Martinson v. Menifee*, 2007 WL 2106516, *7 (S.D.N.Y.

2007) (same); *Zaire v. Doe*, 2006 WL 1994848, *5 (N.D.N.Y. 2006) (same).  Accordingly,

Keesh should be allowed to proceed to trial on his claim that Ekpe retaliated against him by

placing him in keeplock confinement on April 11, 2001.

     **3.  False Misbehavior Report:**  I also find that Keesh should be permitted

to proceed on the claim that defendants retaliated against him by planting a weapon in his cell

and thereafter filing a false misbehavior report charging him with possession of the weapon.

Such a claim fits within the exception to the general rule foreclosing Section 1983 claims based

upon false misbehavior reports.

     It is well-settled that "a prison inmate has no general constitutional right to be free

from being falsely accused in a misbehavior report."  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d

Cir. 1997); *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986) ("filing of unfounded charges

[does] not give rise to a *per se* constitutional violation actionable under section 1983").  A

Section 1983 claim based upon a false misbehavior report may proceed, however, "when the

false charges are allegedly brought in retaliation for an inmate's exercise of his substantive

constitutional rights."  *Rodriguez v. Phillips*, 66 F.3d 470, 477 (2d Cir. 1995); *see also Boddie v.

Schnieder*, 105 F.3d at 862 (to state a Section 1983 claim based upon filing of false misbehavior

reports, "[t]here must be more, such as retaliation against the prisoner for exercising a

constitutional right"); *Franco v. Kelly*, 854 F.2d at 589 (Section 1983 claim may properly be

based upon claim that prison officials filed false disciplinary charges against prisoner in

retaliation for his cooperation in investigation of inmate abuse).

Here, Keesh alleges that Officer Mendez told him that Donnelly, Monahan, Ekpe and Kearney were "seeking to set him up with a fabricated misbehavior report," and that Donnelly informed him that he knew Keesh never had a weapon, but was determined to make him suffer as a result of the lawsuits and complaints Keesh had filed against him.  (Docket # 1 at ¶¶ Ze, Zl).  Keesh further claims that "Monahan and Ekpe informed me that they knew I was set up but that they were going to make sure I suffered because I wrote complaints and grievances against officials for assaulting prisoner Simpson."  (Docket # 1 at ¶ Zm).  These specific allegations of retaliatory admissions counter defendants' sworn assertions that they did not retaliate against Keesh; the resulting factual dispute is material and must be resolved by a jury. Accordingly, Keesh should be permitted to proceed with his claim of retaliation based upon the filing of a false misbehavior report.  *See Payne v. Axelrod*, 871 F. Supp. at 1556 (valid Section 1983 retaliation claim stated where prisoner alleged that corrections officers planted contraband evidence in his cell and falsely charged him with its possession).

   **4.  Election for Inmate Grievance Committee:**  In his final retaliation claim, Keesh alleges that defendants fabricated the results of an inmate election to the IGRC, causing him to lose.  Keesh has not presented any specific, non-conclusory evidence in support of this claim.  (*See* Docket # 84 at ¶ 23 ("I sought to become a grievance representative . . ., but due to Donnelly's retaliatory motives against me[,] the ballot was rigged so I would not be elected")). By contrast, Kieliszek has submitted an affidavit affirming that Keesh received the fewest votes of the four inmates who participated in the election.[8]  (Docket # 79 at ¶ 5).  According to Kieliszek, the votes were counted both by an inmate IGRC clerk and an inmate who was a

---

[8]  A copy of the official vote tally has been submitted to the Court.  (Docket # 79, Ex. A).

member of the Inmate Liaison Committee.  (*Id.*).  Finally, Kieliszek declared that the votes were not altered in any way.

Considering the record in its totality, I find that Keesh has failed to present any credible evidence to counter Kieliszek's sworn assertions.  *See McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *Houston v. Zen Zen*, 388 F. Supp. 2d at 175; *Nichols v. Metropolitan Life Ins. Co.*, 180 F. Supp. 2d 413, 419 (W.D.N.Y. 2001).  Keesh has offered nothing more than conclusory allegations to support his claim.  Because I find them insufficient as a matter of law, I recommend that defendants' motion for summary judgment on this claim be granted.

B.  **Keesh's Access to the Courts and First Amendment Claims**:  Keesh also claims that his First Amendment rights of access to the courts and the free exercise of his religion were violated by the confiscation of his typewriter, legal papers, bowties and religious training manual.[9]  (Docket # 1).  Both parties seek summary judgment on these claims.  For the reasons discussed below, I recommend that defendants' motion be granted.

A prisoner's constitutional right of access to the courts is implicated when prison authorities "actively interfer[e] with inmates' attempts to prepare [or file] legal documents." *Lewis v. Casey*, 518 U.S. 343, 350 (1996).  To prevail on such a claim, the inmate must show a "relevant actual injury."  *Id.* at 351.  As the court has explained, the inmate must:

> [d]emonstrate that [prison practices] hindered his efforts to pursue
> a legal claim.  He might show, for example, that a complaint he

---

[9] It is unclear whether Keesh seeks to assert a Fourteenth Amendment due process claim for loss of property.  If he does, such a claim is unavailing.  Where the state provides an adequate post-deprivation remedy for property loss or destruction, a federal claim may not be brought.  *See Hudson v. Palmer*, 468 U.S. at 533.  In New York State, such a remedy is available under the New York Court of Claims Act and forecloses a federal claim.  *See, e.g., Leitzsey v. Coombe*, 998 F. Supp. 282, 289 (W.D.N.Y. 1998) (granting summary judgment for defendants on plaintiff's loss-of-property claim); *Gadson v. Goord*, 1997 WL 714878 at *7 (dismissing plaintiff's claim for deprivation of his legal documents and medical records).

> prepared was dismissed for failure to satisfy some technical
> requirement which, because of deficiencies in the prison's legal
> assistance facilities, he could not have known.  Or that he suffered
> arguably actionable harm that he wished to bring before the courts,
> but was . . . unable even to file a complaint.

*Id.*  An inmate cannot satisfy this showing through mere conclusory assertions; rather, he must

"designate[] specific facts showing a genuine issue for trial."  *Arce v. Walker*, 58 F. Supp. 2d 39,

44 (W.D.N.Y. 1999) (quoting *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)).

In the instant matter, Keesh asserts that the confiscation of his typewriter and legal

materials denied him access to the courts by causing him to "receive unfavorable Court

decisions."  (Docket # 1 at ¶ L).  During his deposition, Keesh explained that his "trial notes"

were taken during the March 2001 cell search and that the loss of those notes deprived him of the

ability to pursue a claim for ineffective assistance of counsel in his 1990 criminal trial.  (Docket

# 72-2 at 35-37).  Keesh has not demonstrated, however, how the notes would support a claim of

ineffective assistance of counsel, nor has he explained his failure to raise that claim at any time

during the ten years between his conviction and the cell search.  Although "'the taking of an

inmate's papers will often interfere with an inmate's right of access to courts,' the Court may not

presume harm, and some showing of impaired access is required."  *Arce v. Walker*, 58 F. Supp.

2d at 44 (quoting *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997); *Oliver v. Fauver*, 118 F.3d 175,

178 (3d Cir. 1997)).  Keesh's conclusory assertions regarding his legal papers are insufficient to

support his First Amendment access to the courts claim.  *See Boswell v. Mayer*, 169 F.3d 384,

387 (6th Cir. 1999); *Arce*, 58 F. Supp. 2d at 44.

Keesh's assertion that he was wrongfully deprived of his typewriter for two

months is likewise insufficient to support a First Amendment claim.  Specifically, Keesh alleges

23

that "due to the confiscation of my typewriter, I was deprived of sending letters to family,

friends, law offices and Courts. (Docket # 1 at ¶ L). Although it is clear that prison inmates have

a First Amendment right to send and receive mail, *see Wolfish v. Levi*, 573 F.2d 118, 130 (2d Cir.

1978), *rev'd on other grounds*, *Bell v. Wolfish*, 441 U.S. 520 (1979); *Knight v. Keane*, 247 F.

Supp. 2d 379, 384 (S.D.N.Y. 2002), Keesh has not alleged a violation of that right. The First

Amendment does not guarantee the use of a typewriter, *see Roston v. Mantello*, 1995 WL

129044, *3 (W.D.N.Y. 1995) ("[i]nmates have no constitutional right to the use or possession of

a typewriter"), and Keesh has not presented any evidence to suggest that he was unable to send

handwritten letters during the two-month period. Indeed, the record is replete with copies of

handwritten letters and grievances that Keesh prepared during the time he was without his

typewriter, and he has admitted that nothing prevented him from writing his correspondence by

hand. (Docket # 64-6 at 45). For these reasons, I find that Keesh has not sufficiently alleged a

First Amendment claim based upon the temporary confiscation of his typewriter.

Summary judgment for defendants should also be granted on Keesh's free

exercise of religion claim. Keesh alleges that his bowties and religious training manual were

taken during the cell search. As a result, he asserts, he was unable say his prayers and groom

himself according to the Nation of Islam "dress code." (Docket # 72-2 at 24-25). "The Free

Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to

explore ... religious beliefs in accordance with the dictates of their conscience.'" *Jackson v.

Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.

1984)). That citizenry includes prisoners. *Id.* ("[p]risoners retain their right to religious freedom

[under the First Amendment] even when incarcerated"). To assess a free exercise of religion

claim, a court must determine:

> (1) whether the practice asserted is religious in the [prisoner's]
> scheme of beliefs, and whether the belief is sincerely held; (2)
> whether the challenged [conduct] of prison officials infringes upon
> the religious belief; and (3) whether the challenged [conduct] of the
> prison officials furthers some legitimate penological objective.

*Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988).

The infringement upon the prisoner's belief must be more than a mere

inconvenience, the prisoner "must first demonstrate that the state action substantially burdened

his [] exercise of religion." *See Boomer v. Irvin*, 963 F. Supp. 227, 231 (W.D.N.Y. 1997) (citing

*Abdul-Malik v. Goord*, 1997 WL 83402, *7 (S.D.N.Y. 1997)); *see also Davidson v. Davis*, 1995

WL 60732, *5 (S.D.N.Y. 1995) ("This interference must be more than an inconvenience, the

burden must be substantial and an interference with a tenet or belief that is central to religious

doctrine") (quoting *Graham v. Commissioner*, 822 F.2d 844, 851 (9th Cir. 1987)).

For purposes of this motion, the Court assumes that Keesh is sincere in his

religious beliefs. His allegations, even when liberally read, nonetheless do not amount to a free

exercise violation. Keesh does not contend that he was unable to attend religious services or that

he was forced to alter or abandon any specific religious belief. While the loss of his training

manual, which presumably could have been replaced, and the loss of his bowties, which were

returned to him the next month, were likely an inconvenience, I do not find that they posed a

substantial burden on Keesh's ability to practice his religion.

I therefore recommend that defendants' motion for summary judgment on Keesh's

First Amendment access to the courts and free exercise of religion claims be granted.

25

C. **Keesh's Due Process Claim:**  In his final claim, Keesh alleges that he was denied due process of law because he did not receive a fair disciplinary hearing on the misbehavior report charging him with possession of the weapon found during the Mary 2001 search of his cell.  According to Keesh, Hearing Officer Thomas Schoellkopf was biased against him and told him that he had predetermined his guilt.  (Docket # 84 at ¶ 36).  He was convicted after the hearing and sentenced to confinement in the special housing unit ("SHU") and loss of privileges for 180 days.  In September 2001, the disciplinary determination was reversed by defendant Selsky, Director of Special Housing/Inmate Discipline, based upon his finding that the "circumstances of the case warranted further inquiry into the reason for [the] search."  (Docket # 82, Ex. C).

Under the Fourteenth Amendment, prison inmates may not be deprived of a protected liberty interest without due process of law.  *Franco*, 854 F.2d at 587.  To prevail on a Section 1983 due process claim, a prisoner must demonstrate that (1) he possessed a liberty interest; and (2) the defendants deprived him of that interest as the result of insufficient process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001).  Determination of whether a liberty interest exists requires the court to consider whether the restraint at issue "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Id.* (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  The "inquiry under *Sandin* [is] whether the duration of plaintiff's actual period of administrative or disciplinary confinement and the conditions manifest in both the general population of the prison and other segregative housing as to give rise to a liberty interest."  *Id.*

26

Defendants in this matter do not appear to dispute that Keesh possessed a liberty interest.[10]  Rather, they argue that Keesh received all the process he was due.  Keesh, on the other hand, acknowledges that he was provided with a disciplinary hearing, but argues that such hearing did not satisfy the Due Process clause because the hearing officer had prejudged his guilt.

A prison "inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996).  In addition, there must be at least "some evidence to support the findings made in the disciplinary hearing. *Superintendent v. Hill*, 472 U.S. 445, 457 (1985); *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992); *Black v. Selsky*, 15 F. Supp. 2d 311, 317 (W.D.N.Y. 1998).  Nevertheless, "the degree of impartiality required of prison hearing officers does not rise to the level required of judges generally." *Black v Selsky*, 15 F. Supp. 2d at 317 (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)).  Rather, as the Supreme Court stated in *Wolff v. McDonnell*, 418 U.S. 539, 571 (1974), the hearing officer must not be so insufficiently impartial as to pose a "hazard of arbitrary decisionmaking."  Keesh's sworn assertion that Schoellkopf told him he that he (Schoellkopf) had determined Keesh's guilt before conducting the hearing – the truth of which is vigorously disputed by Schoellkopf – adequately raises a triable issue of fact on his Section 1983 due process claim against Schoellkopf.  Accordingly, I deny both parties' for summary judgment on this claim.[11]

---

[10]  Although it is unclear precisely how long Keesh was confined in SHU before Director Selsky reversed the determination, I agree that the length of the confinement, which plainly extended over most of the summer of 2001, implicates a protectible liberty interest.

[11]  Having reviewed the record carefully, I find that Keesh has allegedly no specific facts upon which a due process claim may be asserted against defendant Selsky, the DOCS official who reversed the disciplinary determination.

In sum, I recommend that defendants' motion for summary judgment be granted on plaintiff's (1) Section 1983 claims against defendants Clark, Goord and Eagen; (2) Section 1983 retaliation claims based upon the cell searches and IGRC election; (3) First Amendment claims of access to the courts and free exercise of religion; (4) Fourteenth Amendment due process claim against defendant Selsky.  Retaliation claims against defendants Donnelly, Ekpe, Monahan, Kearney, Mendez, Ball and Hatfield should be permitted to proceed (other than as specified above), and the due process claim against defendant Schoellkopf also should be permitted to go forward.[12]

## IV.  Keesh's Cross-Motion

Plaintiff cross-moves for summary judgment on his claims against defendants.  As noted above, I find that defendants have shown their entitlement to judgment as a matter of law on some of the claims.  As to the others, I find that genuine disputes of material fact exist and render summary judgment on them inappropriate for either party.

---

[12]  I reject defendants' assertion that they are entitled to qualified immunity.  This defense is raised in wholly conclusory fashion (*see* Docket # 70 at 25), and defendants have failed to establish their entitlement to such protection.

## <u>CONCLUSION</u>

For the foregoing reasons, it is the recommendation of this Court that District

Attorney Clark's motion for summary judgment **(Docket # 62)** be **GRANTED,** that the DOCS'

defendants motion for summary judgment **(Docket # 69)** be **GRANTED in PART and**

**DENIED in PART** and that Keesh's cross-motion for summary judgment **(Docket # 83)** be

**DENIED**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        September   14   , 2007

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

                         *s/Marian W. Payson*
                            MARIAN W. PAYSON
                          United States Magistrate Judge

Dated: Rochester, New York
           September   14  , 2007